<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TRAVELODGE HOTELS, INC., a Delaware Corporation, | : : : | |
| | : | Civ. No. 02-2889(DRD) |
| Plaintiff, | : : | |
| v. | : : | **O P I N I O N** |
| HONEYSUCKLE ENTERPRISES, INC., a Missouri Corporation; and RYAN RICHARDSON, an individual, | : : : : | |
| Defendants. | : : | |

David S. Sager, Esq.
Amy L. Smith, Esq.
PITNEY HARDIN, LLP
P.O. Box 1945
Morristown, New Jersey 07962-1945
    Attorneys for Plaintiff
    Travelodge Hotels, Inc.

John T. Doyle, Esq.
THE GOLDSTEIN LAW GROUP, P.C.
12 Glenside Drive
Annandale, New Jersey 08801

Jeffrey M. Goldstein, Esq.
THE GOLDSTEIN LAW GROUP, P.C.
818 18th Street, N.W.
Washington, DC 20006
    Attorneys for Defendants
    Honeysuckle Enterprises, Inc.
    Ryan Richardson

**Debevoise, Senior District Court Judge**

    The plaintiff, Travelodge Hotels, Inc., ("THI") entered into a license agreement dated

January 9, 2001 (the "License Agreement") with defendant, Honeysuckle Enterprises, Inc. ("Honeysuckle"), authorizing Honeysuckle to operate a Travelodge lodging facility in Branson, Missouri. Defendant, Ryan Richardson, Honeysuckle's owner, guaranteed Honeysuckle's obligations under the License Agreement. The License Agreement terminated in December 2001. THI instituted this action against Honeysuckle and Richardson alleging that they had failed to pay amounts owing under the License Agreement and damages provided for in that Agreement. Defendants allege that Honeysuckle was fraudulently induced to enter into the License Agreement and by way of counterclaim Honeysuckle seeks damages for THI's fraudulent conduct.

The case was tried without a jury. This constitutes my findings of fact and conclusions of law.

## I. The Facts

THI is a Delaware corporation with its principal place of business in New Jersey. It does not itself own or operate hotels; rather it operates a guest lodging franchise system. This system is comprised of trade names and service marks, together with standards and centralized support systems, including a nationwide computer reservation system, which is of particular importance in this case. THI's franchisees are independently operated and owned and are permitted to operate their establishments as Travelodge guest lodging establishments pursuant to individual license agreements.

Honeysuckle is a Missouri corporation with its principal place of business in Branson, Missouri. Richardson, the owner and principal of Honeysuckle, is also a Missouri citizen.

Richardson is a dynamic businessman and a leading figure in Branson. He anticipated,

correctly, the economic growth of that community and in 1986 purchased land at the intersection of two principal roadways where he planned to build a hotel. He constructed an 80 room hotel in 1988 which opened in 1989. In 1992 he added 66 rooms and a swimming pool and another 172 rooms in 1993. He reduced the total number of rooms in 1995 in order to construct a convention center.

After seeing to the completion of the hotel Richardson went into the construction business, which was booming by reason of Branson's rapid growth. He turned over the active management of the hotel to Janette Blair who, in Richardson's words, "does everything." The hotel prospered, although stiff competition developed, including two Travelodge franchisees - the Forget-Me-Not and Kennedy's hotel. Honeysuckle advertised in newspapers and arranged for inserts; it advertised on radio, TV, and the internet and placed advertisements in supermarkets. It worked through travel agents and went after groups. Walk-in business developed over time.

Richardson testified that he never sought to become a franchisee of any franchisor. His testimony concerning his entering into the license agreement is critical to his and Honeysuckle's defense against THI's claims and to his counterclaim based on fraud.

According to Richardson, THI's salesman Evans walked into his office unannounced in June 2000 and sought to interest him in a THI franchise. Richardson said he was not interested in a franchise but was willing to talk again. Evans left after about five minutes. Two months after the June meeting Evans telephoned Richardson and asked to meet again. He arrived at Richardson's office and they talked for an hour or an hour and a half. Evans showed Richardson some photographs and stated that THI wanted to expand its franchises in the Branson market. The two of them went over Honeysuckle's reservation figures and converted them to revenue.

According to Richardson, Evans told him what a THI franchise could do for him, specifically that it could expand his business by 15% of what it was then doing. They discussed THI's franchise fee of 8½% of all sales, whether or not produced through THI's system.

Richardson stated that he wanted support for Evans's assurance that a THI franchise would produce a 15% increase in revenues (about $300,000), because unless there was such an increase there would be no deal. Richardson also wanted sales information concerning the Forget-Me-Not and Kennedy facilities. Evans left and promised to obtain supporting information.

Richardson described the next meeting, which took place in August 2000. It was attended by Richardson, Evans's superior Larson and from time to time Janette Blair. According to Richardson, Evans and Larson produced a document (D92) which purportedly showed that during the period January - December 1999 there were 13,514 requests for reservations in Branson that THI could not fill and that presumably, had Honeysuckle been in the THI system, they would have been referred to Honeysuckle. Going over the figures, Richardson testified, the three men computed that it would only take 5400 of these requests for reservations to produce the $300,000 which would represent a 15% increase in Honeysuckle's gross sales.

This lost business report is a strange document. It states that it was "Run 11 Jan 2003 18:39:57." It is entitled "CENDANT CORPORATION" (THI's parent) "Monthly Lost Business Summary Report." After the notation "MO Branson, MO" there appear figures for each month of the year 1999; the numbers total 13,514. The document offered (and received) in evidence was not the document submitted to Richardson in August 2000. He testified that it looked like the document he was given. He does not have the document he received or know what became

4

of it. Nevertheless, he testified that this is what convinced him that he could accept Evans's and now Larson's assurances that entry into a franchise with THI would increase his business by 15%.

At the August meeting the participants discussed the requirements that would be imposed upon Honeysuckle to upgrade its facilities in accordance with a THI punch list, including installation of a key card lock system, replacement of carpeting, installation of Travelodge signs, and providing Travelodge items such as soaps, ball point pens and other items. Richardson stated that he still had doubts after the August meeting but expressed a willingness to proceed further.

In November 2000, according to Richardson, Evans and Larson again met with him and General Manager Blair. They discussed the lost business report and went through the figures once again which convinced Richardson that the projection of a 15% profit increase was plausible. Blair was less convinced. She testified that she attended parts of three of the meetings and saw the lost business report which has been marked as Exh. D92. With her intimate familiarity with Honeysuckle's records she thought a 15% increase in profits arising from a Travelodge franchise was large, "far fetched," but perhaps believable in light of the figures that Evans and Larson produced. She expected that the projection would be included in the License Agreement. Richardson testified that he would not have signed a license agreement without the assurance that it would result in a 15% increase in his profits. As claimed in Defendant's trial brief, "Richardson made crystal clear to Travelodge that he would sign a franchise agreement only if Travelodge could and would promise to give Richardson at least a 15% reservation contribution."

In any event, at the fourth meeting held in November, Richardson testified that he was getting comfortable with the 15% figure and wanted to move forward. At that meeting and/or at a December meeting, Richardson and Evans and Larson went over the form of THI's license agreement. On three occasions Richardson had been provided with a THI Uniform Franchise Offering Circular ("UFOC"), a bulky document which "summarizes certain provisions of the license agreement and other information in plain language." The prospective licensee was advised to "READ THIS OFFERING CIRCULAR AND ALL AGREEMENTS CAREFULLY." The date of the first acknowledgment of receipt of a UFOC is July 26, 2000. The dates of the other receipts are August 7, 2000 and December 18, 2000. The UFOC contained several provisions concerning reservations, including "WE DO NOT FURNISH OR AUTHORIZE OUR SALESPERSONS TO FURNISH ANY ORAL OR WRITTEN INFORMATION CONCERNING ACTUAL, PROJECTED OR POTENTIAL COSTS EXPENSES OR PROFITS OF A PROPOSED FACILITY." Mr. Richardson testified that he was not interested in the UFOC and threw it away without reading it.

Mr. Richardson reviewed the terms of the proposed License Agreement with Evans and Larson and insisted on three changes. He sought an "Additional Termination Right" pursuant to which Honeysuckle could terminate the License Agreement at the end of two years (as opposed to 15 years). He sought reduced liquidated damages in the amount of $50,000 (as opposed to $420,000). He sought to revise the monthly "Special Recurring Fees" from 8½% of gross room revenues to a monthly flat fee of $8,125 payable during the first license year (which amounted to approximately 4% of Honeysuckle's historical gross room rentals with increasing fixed monthly amounts during subsequent years.

In January 2001 Evans and Larson returned with the License Agreement dated January 9, 2001, which had been amended to incorporate the changes that Richardson had requested. He testified that he confirmed that the changes had been made but did not read the agreement. He signed on behalf of Honeysuckle and Blair witnessed his signature. Attached to the License Agreement was a Punchlist for Conversion setting forth the many improvement and management changes Honeysuckle would have to make. This document was dated December 15, 2000. Also attached to the License Agreement was the Guaranty of Honeysuckle's obligations that Richardson signed. The parties also entered into a January 9, 2001 Software and Service Agreement and a January 9 Integrated System Agreement.

The License Agreement did not contain a provision requiring that reservations received through THI's reservation system produce a 15% increase in Honeysuckle's profits. With respect to reservations, Section 4.2 of the License Agreement set forth THI's obligations as follows:

> 4.2 Reservation System. We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties), with funds allocated from the collections of the System Assessment Fees, a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the allocated System Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if your Recurring Fee payments are up to date. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer callers to our general consumer toll free reservation telephone number in the United States the opportunity to make reservations for other lodging chains.

Section 14.3 disavowed any express covenants or warranties:

> 14.3 No Misrepresentations or Implied Covenants. All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of

>any such person or entity, was or will be at the time delivered and when you sign this Agreement, true accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances.  there are no express or implied covenants or warranties, oral or written, between we (sic) and you except as expressly stated in this Agreement.

Paralleling the UFO, the License Agreement includes provisions that disclaim the kinds of representations that Richardson stated were made to him:

>17.7.2 Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.
>
>17.7.3 This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.
>
>17.7.4 You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

After signing the License Agreement and related agreements, Honeysuckle proceeded to implement requirements set forth in the Punch List, including installation of electronic locks at a cost of approximately $70,000.  Richardson testified that these locks were inferior to Honeysuckle's original key locks, because they often malfunctioned due to their exposure to dampness in the outside air.  A March 29, 2001 THI letter to Richardson served "as official notice that you are available for bookings through central reservations as a 210 room Travelodge, effective April 1, 2001.  In addition, the franchise fees will commence April 1, 2001.  You may install the Travelodge signs, answer the telephone 'Travelodge,' and display Travelodge supplies, effective April 1, 2001.  April 1, 2001 is your official opening date."

It is undisputed that from the outset Honeysuckle failed to pay the monthly special fee of $8,125.  It is Honeysuckle's and Richardson's contention that THI never put Honeysuckle on THI's central reservation system.  Richardson testified that Honeysuckle received only 13 reservations through THI as determined from certain Fax reservations.  He communicated with Evans about the reservations problem, and Evans referred him to THI's franchise service manager, Danica Boyd.  He complained to her on a number of occasions that Honeysuckle was not getting reservations and she promised to check it out.  He testified about calling THI's 800 number, asking for a Travelodge hotel in Branson and receiving no mention of Honeysuckle.  Asking specifically for Honeysuckle he stated that he was told Honeysuckle was not listed.

General Manager Blair provided similar testimony.  She testified that 14 FAX reservations were derived through THI, that she complained to Boyd in May and received a few (less than five) reservations through THI after the telephone call to Boyd.  Repeated calls to Boyd produced no results.  She testified that in April she called THI's 800 number and that they referred her only to the other two Travelodge hotels in Branson.  She testified that she made an 800 call about five times and always received the same response - no mention of Honeysuckle.  At her deposition Blair testified somewhat differently, stating that she had called central reservations through the 800 number but recalled doing that only once and did not recall when she had done it.

Boyd's testimony reflects a somewhat different state of affairs.  She reported talking on the telephone with Richardson on occasion, but that her principal communication was with Blair.  She maintained a detailed log of the substance of these conversations (Exh. D-6).  During the period prior to the April 1, 2001 opening date the subject matter was primarily about the many

9

steps Honeysuckle was taking to prepare the facility so as to meet THI requirements.

Boyd's copious notes of her conversations with Blair between April 1 and July 27, 2001 reflect the many suggestions Boyd was providing Blair for increasing reservation, improving the Honeysuckle facility and equipment and complying with THI reporting requirements. None of the entries reflect any dissatisfaction on Honeysuckle's part about the number of reservations being received through the THI system, although Boyd discussed with Blair a number of THI programs in which Honeysuckle might participate which would be likely to increase reservations. Several of the entries reflect that Honeysuckle was on the CRS system and that Honeysuckle was satisfied with the handling of the 800 number. An April 9, 2001 entry recited "[v]erified that they were loaded in CRS and checked the information." A May 7 entry read "TEST CALL. Janette did a couple test calls to the 1-800 # and was very pleased! She has asked her FOM to do a couple every few weeks or so.!"

The May 24, 2001 entry included the following: "Chris called me today and asked what we could do for them. I advised him the following were items I had promised I would do for Janette [Blair]: 'GDS' - They are being showcased in 3 out of the 4 Systems the first week in June and July for FREE CRS - asked Donna Owens at CRS to have this property highlighted with the agents. They come up as a flip flop in the rotation with the agents in CRS. Group Sales - the[y] have not had the SRP's - SNT and SPT (Group Codes) built in their system nor do they have a group sales page. Janette stated that their Sales Team works on commissions, and she needs to discuss with the owner what they want to do. I advised her that these codes and the Group Sales Page are what our Group Sales Team in Phx use to book groups that all the 1-800 #. Faxed Sales Lead form to Janette to acquire group leads for the property."

Honeysuckle failed to pay the monthly Recurring fees for April, May and June. THI notified Honeysuckle in July that as a result of these defaults THI might terminate Honeysuckle's access to the central reservation system. Boyd's July 27, memoranda entry is the first reflection of a concern on Richardson's part about the number of reservations Honeysuckle was receiving through THI. Blair had requested that THI delay Honeysuckle's suspension from CRS so that she could address the financial defaults with Richardson. The July 27 entry read in part: "Janette advised us that Ryan Richardson has not authorized her to submit their franchise reports, nor is he paying franchise fees. Ryan [Richardson] is on vacation until August 10. In good faith Paul agreed to wait until Ryan gets back from vacation to discuss this further. Ryan and I spoke on one occasion, and he is very upset with res contribution. Will f/up with Ryan Richardson on 8/10/01."

Blair's follow-up with Richardson produced no results and in August 2001 THI suspended Honeysuckle from the CRS, as it was entitled to do under section 11.4 of the License Agreement. Thereafter Honeysuckle notified THI of its intention to terminate the franchise and stopped operating its hotel as a Travelodge. Learning of this, THI issued an acknowledgment of termination effective December 18, 2001 and demanded payment of outstanding Recurring Fees and liquidated damages.

## II. Discussion

A. <u>Jurisdiction and Applicable Law</u>: The court has diversity jurisdiction by virtue of 28 U.S.C. §1332. Pursuant to Section 17.6.1 the License Agreement is governed by the laws of New Jersey (except for its conflict of laws principles) and the New Jersey Franchise Practice Act does not apply.

B. <u>Fraudulent Misrepresentation</u>: Honeysuckle's defense and the basis of its counterclaim is that THI guaranteed that upon becoming a THI franchisee Honeysuckle's sales or room reservations would increase by 15% and that THI induced Honeysuckle to rely upon this guaranty by showing Richardson and Blair the Monthly Lost Business Report that reflected that during the period January 1, 1999 through December 31, 1999 THI had 13,514 more requests for rooms in Branson than it could provide. Presumably had Honeysuckle been a THI franchisee these requests would have been referred to it, and at least a 15% increase in sales would have resulted.

The evidence establishes that Richardson discussed with Evans and Larson his position that he was not interested in entering into a franchise agreement unless his becoming a Travelodge facility would result in a 15% increase in sales. It is likely that Evans and Larson tried to persuade him that his business would increase to that extent, showing him the curious document entitled "Monthly Lost Business Summary Report" which showed lost business in Branson in 1999 of 13,514 rooms, apparently a much higher figure than was actually the case. Evans denies that he ever promised Richardson that he would obtain a 15% reservation contribution from a THI franchise and he testified that he never heard Larson make such a promise.

Defendants rely on two New Jersey cases. In <u>Ocean Cape Hotel Corp. v. Masefield, Corp.</u>, 63 N.J. Super 369 (App. Div. 1960) a lessee acknowledged in the lease into which he entered that no representations as to the physical condition of the leased property had been made prior to the execution of the lease not expressed in the lease. Plaintiff lessee alleged that he had been induced to enter into the lease on the basis of the lessor's fraudulent oral representations.

The court, although ruling in favor of the defendant lessor, observed, "[i]t is well settled that a party to an agreement cannot, simply by means of a provision in the written instrument, create an absolute defense or prevent the introduction of parol evidence in an action based on fraud in the inducement to contract . . . The evidence is admitted, not in order to enforce the contract, but rather to avoid it, or as here, to prosecute a separate action predicated upon the fraud." 63 N.J. Super. at 377-78.

In <u>Filmlife, Inc. v. Mal "Z" Ena, Inc.</u>, 251 N.J. Super 570 (App. Div. 1991), the Court referred with approval to <u>Ocean Cape Hotel Corp</u>., but noted that "the fraud exception to the parol evidence rule is not without its limits. There is a distinction between fraud regarding matters expressly addressed in the integrated writing and fraud regarding matters wholly extraneous to the writing." 251 N.J. Super. at 574. Rejecting the plaintiff's claim, the court stated:

> In sum, despite plaintiffs' claim of fraud and misrepresentation with respect to the payment of the trade-in value in cash, plaintiffs signed a leasing agreement which not only did not include such terms and conditions, but expressly contradicted such an oral understanding by providing that the trade-in value was a capitalized cost reduction. Plaintiffs' attempt to vary the intent of the parties as expressed in writing does not fit within the fraud exception to the parol evidence rule, and, therefore, the trial court properly dismissed the complaint against defendants on the ground that it failed to state a claim against them upon which relief can be granted.

251 N.J. Super at 576-77

In the present case, as in <u>Filmlife</u>, Honeysuckle signed an agreement which not only did not include a term guaranteeing a 15% sales increase, but expressly contradicted any such representation or guarantee, see sections 14.3, 17.7.2, 17.7.3 and 17.7.4. In particular Honeysuckle released THI from any claims based on oral or written representations not stated in

the License Agreement and agreed that **"no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement."** (emphasis in original).

      Richardson testified that he did not read the License Agreement. A person who signs an agreement is presumed to have read it. In the present case the circumstances are such that Richardson must have read the License Agreement and read it with care. He was provided with a copy of the Agreement long before a final version was brought to him for signature. He negotiated three significant changes in the Agreement: i) an "Additional Termination Right" pursuant to which Honeysuckle could terminate the License Agreement at the end of two years (as opposed to 15 years), ii) reduced liquidated damages in the amount of $50,000 (as opposed to $420,000) and iii) "Special Recurring Fees" in the form of a monthly flat fee that amounted to roughly 4% of the Facility's historical gross room revenues (as opposed to 8½%).

      Richardson carefully checked the License Agreement before he signed it. He was a well-established, successful businessman and would have known that you do not enter into long-term arrangements without reading the governing documents. The evidence suggests that Honeysuckle was not at all sure that its revenues would increase by 15%. Blair testified that she was doubtful that entering into a franchise relationship would produce such an increase. The three changes in the Agreement Richardson obtained suggest that he was not totally convinced that sales would increase 15% and wanted an out if matters did not work out as he hoped. Had he believed that THI had guaranteed the increase in sales he would have insisted on a provision to that effect in the License Agreement instead of signing an agreement that specifically negated

such an assurance.

To sustain its fraud claim THI must establish i) THI made a material representation ii) of a presently existing or past fact, iii) which was false, iv) and was known to be false by THI at the time it was made, v) and was made by THI for the purpose of inducing Honeysuckle to rely on the misrepresentation, vi) and Honeysuckle actually and reasonably relied upon the misrepresentation vii) and Honeysuckle suffered injury as a result, Jewish Ctr. of Sussex County v. Whale, 86 N.J. 619, 624-25 (1981). In the present case any prediction on Evans's or Larson's part that Honeysuckle would enjoy a 15% increase in sales related to future event and cannot constitute fraud in the inducement, because a statement relating to future events cannot satisfy the element of being a statement that is known to be false at the time it is made. Anderson v. Modeca, 4 N.J. 383, 391-92 (1950); Van Dan Egg Co. v. Allendale Farms, Inc., 159 N.J. Super 452, 457 (App. Div. 1985).

Defendants assert that Evans's and Larson's presentation of the 1999 Monthly Lost Business Summary Report constituted a false statement of a past fact because lost business in 1999 did not equal 13,514. However, even if all of the other elements of a fraudulent misrepresentation claim were made, Honeysuckle cannot be deemed to have relied on this sketchy document in face of Honeysuckle's multiple acknowledgments in the License Agreement that no salesman or other representative of THI had made representations about sales or profits. Further, Richardson's lack of reliance is evidenced by his insistence on amendments to the License Agreement that facilitated his terminating the Agreement if it did not live up to his expectations.

Defendants failed to establish their fraud defense or claim.

      C. <u>Breach of Contract Defense</u>: Defendants also defend on the ground that THI breached the License Agreement by failing to put Honeysuckle on its CRT (central reservation system). The basis for this claim is i) Blair's testimony that she test called the Travelodge 800 number and was not referred to Honeysuckle, ii) and the assertedly low number of reservations Honeysuckle received from THI.

      Blair's testimony about the 800 number is cast into great doubt by the conflict in her testimony on deposition where she testified she had made one test 800 call at a time she did not remember and her trial testimony when she testified that she telephone the 800 number five times. Further, Bond's contemporaneous memoranda reflecting her conversations with Blair reflect Blair's satisfaction with the 800 number system and contains no indication that Blair was dissatisfied with it.

      Richardson and Blair testified that Honeysuckle received only 15 reservations through THI as evidenced by FAX reservation forms. Blair also testified that Honeysuckle had records from which it could be ascertained the number of reservations that were derived through THI's system, but defendants failed to produce them. Defendants Exh D-6 discloses that THI provided Honeysuckle with a total of 133 residential rooms as follows: April - 8; May - 10; June - 39; July - 29; August - 45; September (after Honeysuckle was removed from the CRT system) - 2.

      The evidence establishes without question that THI placed Travelodge on its CRT system. Bond's running memorandum of her conversations with Blair contain a number of references to CRT, without any complaint on Blair's part, and how Honeysuckle might take greater advantage of it. When in July THI threatened to remove Honeysuckle from the CRT system Blair sought a reprieve so that she could communicate with Richardson. Nothing resulted

from her consultation with Richardson and THI formally notified Honeysuckle that it was being terminated from the CRT system for failure to pay monthly recurring fees. One cannot be terminated from a system unless one had previously been placed on it.

It is evident that defendants' defense that THI breached the License Agreement by failing to place Honeysuckle on the CRT system is a contrived one. Honeysuckle failed to comply with its obligation to pay recurring fees from the very first month of the commencement of the licensing arrangement, suggesting that it never did intend to live up to its commitments under the Agreement.

D. <u>Damages</u>: Honeysuckle opened and began operating its hotel as a Travelodge in April 2001. Honeysuckle failed to pay any recurring fees (or to comply with certain other provisions of the License Agreement). As permitted by Section 11.4 of the License Agreement, THI suspended Honeysuckle's access to its reservation system in August 2001. Honeysuckle notified THI of its intention to terminate, and when THI learned that Honeysuckle stopped operating its hotel as a Travelodge THI issued on acknowledgment of termination effective December 18, 2001 and demanded payment of all outstanding recurring fees and liquidated damages provided for in the License Agreement.

THI is entitled to recurring fees pursuant to sections 7 and 18.5 and Schedule C of the License Agreement. This amounts to $74,123.27 comprised of i) a flat monthly fee of $8,125 for the months of April through November 2001 and a pro-rated flat fee of $4,716 from December 1, 2001 through December 18, 2001.

THI is entitled to liquidated damages as provided in sections 12.1 and 18.3 of the License Agreement in the amount of $50,000. This is the amount that Richardson negotiated with Evans

and Larson. Liquidated damages have been approved by New Jersey courts where they constitute a reasonable forecast of the provable injury resulting from the breach and where harm is incapable or difficult of accurate estimate. Wasserman's Inc. v. Middletown, 137 N.J. 238, 249-50 (1994). The liquidated damages provided for in this case meet this standard.

Prejudgment interest may be determined by contract. Utica Mut. Ins. Co. v. DiDonato, 187 N.J. Super 30, 43 (App. Div. 1982). Section 7.3 of the License Agreement provides that interest will accrue at the rate of 1.5% per month on all payments that become past due under the License Agreement. THI is entitled to prejudgment interest at the rate of 1.5% per month on the principal amount of recurring fees due to THI from January 14, 2002 (ten days after THI sent its acknowledgment of Honeysuckle's termination effective December 18, 2001) through the date of judgment and on the principal amount of liquidated damages due THI from February 3, 2002 (thirty days after THI sent its acknowledgment of termination through the date of judgment).

Pursuant to section 17.4 of the License Agreement Honeysuckle is obligated to pay THI's attorneys and costs incurred to enforce the License Agreement or collect amounts owing under it. Separate application will have to be made for these fees and costs at which time THI can establish their amounts.

The License Agreement also obligates Honeysuckle to pay i) certain travel agent commissions (section 7 and Schedule C of the License Agreement); ii) certain airline reservation fees (Schedule C of the License Agreement); and iii) fees relating to the North American Sales Program (Schedule C of the License Agreement). Should THI wish to pursue these fees it must establish their amount and apply for them at the time it applies for attorneys' fees.

Richardson guaranteed that "Licensees' obligations under the Agreement, including any

18

amendments, will be punctually paid and performed." Consequently he is personally obligated to THI in the amounts awarded against Honeysuckle.

### III. Conclusion

Judgment will be entered in favor of THI and against defendants on THI's complaint. Judgment will be entered against defendants and in favor of THI on defendant's counterclaim. The court will enter its own form of judgment.

                                        /s/ Dickinson R. Debevoise
November 7, 2005                          DICKINSON R. DEBEVOISE
                                            U.S.S.D.J.